UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DIANNA L. ADAMS                                    CIVIL ACTION

VERSUS                                             NO. 05-2666

JO ANNE B. BARNHART,                               SECTION "J" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION


**<u>FINDINGS AND RECOMMENDATION</u>**

Plaintiff, Dianna L. Adams, seeks judicial review pursuant to Section 405(g) of

the Social Security Act (the "Act") of the final decision of the Commissioner of the

Social Security Administration (the "Commissioner"), denying plaintiff's claim for

Supplemental Security Income benefits ("SSI") under Title XVI of the Act.  42 U.S.C.

§§ 405(g), 1381a.  This matter was referred to a United States Magistrate Judge pursuant

to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

As ordered, plaintiff filed a timely memorandum of facts and law.  Record Doc.

No. 12. Defendant filed a timely reply memorandum.  Record Doc. No. 17.  Because the

record was incomplete, the court ordered defendant to file the missing transcript pages. Record Doc. No. 18.  Defendant filed pages 487-509 of the transcript into the record on May 12, 2006.  Record Doc. No. 21.

I.      PROCEDURAL HISTORY

Adams filed an application for SSI on September 19, 2002, alleging disability since June 26, 2002 because of major depression with psychotic features, bipolar and anxiety disorders, mitral valve prolapse and migraine headaches.  (Tr. 71, 97-99).  After her application was denied, Adams requested and received a hearing before an Administrative Law Judge ("ALJ"), which was conducted on March 4, 2004.  (Tr. 453-76).  On March 19, 2004, the ALJ denied plaintiff's application.  (Tr. 55-70).

The Appeals Council granted plaintiff's request for review and remanded the matter to the ALJ on July 2, 2004.  (Tr. 92-95).  The ALJ held a second hearing on December 2, 2004 and issued an unfavorable decision on December 10, 2004.  (Tr. 13-44).  After the Appeals Council denied review on May 13, 2005, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.

II.     STATEMENT OF ISSUE ON APPEAL

Plaintiff contends that the ALJ made the following error:

A.      The ALJ erred by failing properly to consider and determine plaintiff's residual functional capacity.

2

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

The ALJ made the following relevant findings:

1.   Plaintiff has not engaged in substantial gainful activity since the alleged onset date of July 26, 2002.  She has performed substantial work activity after that date, but it probably was not gainful.  The work was not an unsuccessful work attempt.  Adams was never terminated from any employment and always quit on her own just before her six-month period of employment expired.

2.   The medical evidence establishes that Adams has major depression with psychosis, which is a severe impairment.  However, post-traumatic stress disorder, panic attacks, bipolar affective disorder and personality disorder, not otherwise specified, obsessive compulsive disorder, mental retardation, seizures, malnourishment and agranulocytosis are not medically determinable conditions.  Her gastroesophageal reflux disease ("GERD") and mitral valve prolapse are non-severe conditions.

3.   Plaintiff's depression does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4, including particularly Listing 12.04 for affective disorders.

4.   Claimant's allegations regarding her symptoms, pain, functional limitations and restrictions on activities of daily living are exaggerated, lack corroboration and substantiation in the medical record and are not credible.

5.   Adams is a younger individual with a limited 10th grade education and a GED certificate.  She has no exertional restrictions and no limitations in comprehending and carrying out simple instruction or restrictions in dealing with the public and co-workers.

6.   Plaintiff has no past relevant work.

3

> 7.    Adams is capable of performing work activity, which exists in significant numbers throughout the state and national economies.

(Tr. 44).

IV.    ANALYSIS

    A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2005).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id.

§§ 404.1520, 416.920; <u>Waters</u>, 276 F.3d at 716; <u>Loza</u>, 219 F.3d at 393.[1]  The five-step

inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  <u>Leggett v. Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.

<u>Newton</u>, 209 F.3d at 453.  If she successfully carries this burden, the burden shifts to the

Commissioner to show that other substantial gainful employment is available in the

national economy that the claimant is capable of performing.  When the Commissioner

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  <u>Id.</u> §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  <u>Id.</u> §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  <u>Id.</u> §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  <u>Id.</u> §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  <u>Id.</u> § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified at the first hearing on March 4, 2004 that she was 21 years old and lived with her mother and her five-year-old son in Granite [probably should be Gretna], Louisiana.  She stated that she obtained her GED certificate after she dropped out of school in the tenth grade to have her baby.  She said she is 5 feet 7 inches tall and weighs 125 pounds.  (Tr. 457).  She stated that she had gained or lost more than 25 pounds in the past 2 years, that the most she ever weighed during that time was 135 pounds and that she had gained back what she had lost.  (Tr. 457-58).

Adams testified that she had been working as a cashier at Boomtown Casino in May 2003, where she had to lift 30-pound bags of coins every 15 to 20 minutes.  She stated that she had worked there for three or four months but that the employer "released me due to my conditions," which she described as major depression with psychotic features, an emotional disorder, migraine headaches and lower back pain.  She said the

7

psychotic features were that she had tried to commit suicide or homicidal attacks. (Tr. 458).

Plaintiff said she had been hospitalized for mental problems in June or July 2002 at DePaul Hospital.  She denied that she had been a heavy alcohol drinker at any time. She stated that she never had a drinking problem but admitted that she had been drinking during a social event at the lakefront just before she was admitted to DePaul.  She said her last alcoholic drink was in 2002, and before that time she would drink wine coolers about every other weekend.  (Tr. 459).

Adams stated that her father and mother help her take care of her son.  (Tr. 459). She said she usually goes to bed around 7:00 or 8:00 p.m. and wakes up around noon. She testified that she sleeps through the night because of the sleeping pills she takes.  She stated that during the day she goes out and fills out applications, or she lies down all day. She said she has a driver's license but had last driven a car about a month earlier, when she had driven her boyfriend's car.  (Tr. 460).

Plaintiff testified that her boyfriend, Joseph Thomas, is 30 years old and employed as a truck driver.  She said she has known him for two years and that he takes her out to a movie or a park when they go out. (Tr. 461).

Adams stated that sometimes she lies down all day because she has a migraine headache and feels nauseous.  (Tr. 461-62).  She said she has a migraine headache about

8

every other day.  She confirmed that she had told her doctor in July that Imitrex was not

working and that she was having daily headaches.  She also confirmed that she had told

her doctor in April 2002 that sometimes her headaches lasted three to seven days.  She

explained that having a headache every other day means that the headaches might come

and go more than once during one day, then let up for a day, then return the following

day.  (Tr. 462-63).

Plaintiff testified that she currently sees Dr. Bouchette once a month, who

prescribes Frova for her migraines.  She stated that the medication works sometimes and

her headache goes away for three or four days, but sometimes the headache comes right

back.  (Tr. 463).  She said she has reported this to Dr. Bouchette, who advised her to try

taking two pills.  (Tr. 463-64).  She testified that she has tried taking two pills, but it

made no difference.

Adams stated that she began working in May 2003 but began going through an

emotional and stressful period, during which she became depressed and tried to harm

herself.  She said she was so emotionally stressed at work and she missed so much work

because of visits to the doctor that the employer let her go.  She stated that she sees Dr.

Mason at the mental health clinic.  (Tr. 464).

Plaintiff testified that she has been having memory lapses for almost a year.  She

confirmed that she told Dr. Mason on January 20, 2004 that she was not sleeping and

sometimes stayed awake all day and night, for a couple of months.  She said Dr. Mason initially prescribed 50 mg. of Trazodone, a sleeping pill, which did not help, and then Dr. Mason raised it to 100 mg.  She stated that she only missed appointments when the clinic did not have room to take her and that the clinic finally mailed her an appointment in December.  (Tr. 465).

Adams said that she had trouble with housing the past January after she and her mother had an altercation.  She stated that her mother threw her out and her son went to a shelter.  She testified that in December of the previous year she had taken a razor out with the intention of slitting her wrists.  She said she was taking her medications at the time.  (Tr. 466).

Plaintiff stated that she had been hospitalized for seizures once when she passed out and her sister called an ambulance.  She said she was told, when she woke up in the hospital, that she had had a seizure.  She stated that she had had seizures before that incident.  She said the doctor prescribed Tegretol XR and she has not had any seizures since.  She stated that she sees Dr. Mason once a month.

Adams testified that she has a history of abusive situations, with the last one occurring in 2002.  (Tr. 467).  She said she still hears voices, which sometimes tell her to give up and harm herself, and that sometimes she tries to do that.  She stated that she has tried to kill herself in the past by jumping off a roof, walking in front of a car,

10

choking herself with a belt and cutting herself with a knife.  (Tr. 468).  She said she went to the mental health clinic after she was released from DePaul Hospital because she found herself in the middle of the street.  (Tr. 468-69).  She stated that she was released from the hospital and transferred to outpatient status at the clinic.

Plaintiff said she attends group therapy once a month, on the same days that she sees Dr. Mason.  She also sees Dr. Bouchette once a month but said that her migraines have gotten worse, not better, since she began seeing him.  (Tr. 469).  She testified that she has to lie down and rest for about 24 hours when she gets a migraine headache.  She said she takes Excedrin for migraines along with her prescription medication.  (Tr. 469-70).  She stated that she feels dizzy and light-headed when she has to get up with a migraine.  She said this was not a side effect of the medication but had always been a symptom of her headaches.  Plaintiff testified that Dr. Bouchette had run some tests on her lower back but had found no reason for her back pain.  She said she takes Prozac for her GERD, and that the medication helps.  She said the GERD does not keep her from working.  (Tr. 470-71).

Adams testified that she was admitted to DePaul Hospital because she tried to kill her boyfriend and herself.  She said that this was a different boyfriend than her current one, whom she has known for two years.  She said she had known the previous boyfriend

for about six months when this incident occurred.  She testified that her current boyfriend had recently been released from jail for a DWI offense.  (Tr. 471).

Plaintiff stated that she had tried to kill her previous boyfriend after he tried to drown her in the lake when they were having a get-together at the lakefront.  She said he was intoxicated and refused to leave when she wanted to leave, then he grabbed her purse and drove off.  She testified that she was in the water with her son when her boyfriend returned and that he came into the lake and held her head under the water.  She stated that she then got out of the water, got a knife and tried to cut him.

Adams testified that the police came and arrested her boyfriend, and that she went back to the shelter and tried to kill herself with the same knife.  (Tr. 472).  She stated that she was taken to Charity Hospital because she was suicidal, and was then transferred to DePaul Hospital.  (Tr. 472-73).

Plaintiff stated that the lowest amount she ever weighed was 106 pounds and the highest was 135 pounds.  She said the weight loss was the result of her GERD problem and that she now takes Prevacid for that problem.  (Tr. 473).

At the second hearing on December 2, 2004, Adams testified that she lives in Gwendolyn [probably should be Gretna], Louisiana and is 22 years old.  She said she received her GED in February 2003.  She stated that she weighs 132 pounds, which is above her normal weight because of the Periactin she takes, and that she had gained 20

12

pounds in the past 3 months.  She said her last job had been as a customer service representative for four and one-half months at a Sav-A-Center store on Belle Chasse Highway in Gretna.  She said she handled returns of groceries, issued money orders and sent cash through Western Union.  She stated that she was terminated for too many excused absences.  She testified that she always brought a doctor's note and hospital records for her excused absences.  (Tr. 481-82).

Plaintiff testified that her last hospitalization had been on Thanksgiving night, November 25, 2004.  She said she had a migraine headache all day and had taken some medicine for it.  She stated that the headache eased around noon but that she started feeling dizzy and short of breath in the evening.  She testified that she asked her sister to bring her some water because she could not breathe, and that she passed out and hit her head on the fireplace before her sister returned.  She said she had used marijuana only once when she was 18 years old and that she had never used crack.  (Tr. 483).

Adams testified that sometimes she gets up at 6:00 a.m. to get her son ready for school but sometimes she oversleeps and gets up between 9:00 and 10:00 a.m.  She stated that she watches television most of the night because she has trouble sleeping, although Dr. Mason prescribed sleeping pills for her.  She stated that she has a driver's license but had not driven for about five months.  She said she has a car but chooses not to drive

because she panics when she is behind the wheel and has almost caused numerous accidents. (Tr. 484).

Plaintiff said she currently takes Periactin twice a day, Seroquel once at night, Geodon twice at night, Wellbutrin once in the morning, lithium once in the morning and twice at night. (Tr. 484-85). She said she has GERD problems often. She stated that she has been prescribed Prozac and Prilosec in the past for GERD, but she is not taking any prescription medicine and only takes over-the-counter medication for it now.

Adams said she can walk for a couple of blocks but cannot stand more than five or ten minutes. She said she can sit for three or four hours, but she often gets dizzy when she stands up too fast. (Tr. 485).

Plaintiff testified that she still hears voices most of the time, which tell her to harm herself or the people around her. She said she has lately been very violent towards several people, such as pulling out knives and choking people. She stated that she stabbed her boyfriend because she saw him with someone else and it scared her. However, she then said that she thought he was someone else and she took her anger out on him. She stated that neither she nor her boyfriend had been drinking at that time. (Tr. 486). She said that incident had occurred last year.

Adams testified that she had recently choked her boyfriend, punched him in the eye and continued to try to hit him when he held her hands together. She stated that the

police were called, but they did not arrest her.  She said her boyfriend did not want her to go to jail because of her son.  She said the incident in 2002 when she tried to stab a boyfriend after he tried to drown her was a different boyfriend.

Plaintiff stated that her medications had been changed recently because she had told her doctor they were not working.  She felt the medicines were not working because she was always angry, aggressive, sad, crying and violent towards herself and others, and she had a bad temper and could not sleep.  (Tr. 487).

Adams testified that she was hospitalized in September 2004 because she took an overdose of her medicine.  She said that she had been feeling sad and very depressed all that day, missing her sister who had died on July 1st, and that the voices told her to kill herself.  She stated that she hesitated at first but the voices just kept getting louder, so she took three Geodon.  She testified that the hospital pumped her stomach.

Plaintiff said she only gets to talk to Dr. Mason at the mental health clinic for five to ten minutes each month, but she is able to talk to the nurse as well, who writes everything down and reports it to Dr. Mason.  She stated that she attends counseling for anger management on Mondays, domestic violence on Wednesdays and depression on Fridays.  (Tr. 488).  She testified that the therapy does not help but that she feels a little better being around people who are going through the same thing as she is.

Adams said the man who abused her as a child is in jail and that she has flashbacks about that. She said he escaped once and she thought he was coming after her because he showed up at her house, and her mother was going to let him in. Plaintiff said she ran away for two weeks until the man was caught and returned to jail.

Adams testified that she gets migraine headaches on numerous occasions, such as if she gets overly excited, stressed or depressed or if she sleeps or sits too long. She stated that the headaches get so bad that she starts to cry and shake. (Tr. 489). She said she has tried four different prescription medications but nothing has worked for more than a few minutes. She testified that she now takes Excedrin, which helps.

Adams said her weight went up and down and at one time was 108 pounds. She said her doctors did tests and told her the weight loss was the result of stress. (Tr. 490).

Plaintiff stated that, when she is not going to counseling, she stays in the house because she does not want to be bothered with anyone on the outside and is afraid to go out. She said she does not want her son to be stuck inside all the time, so he stays with her sister most of the time. (Tr. 490-91). She testified that she occasionally helps him with homework. She said she does not go grocery shopping by herself, but her brother goes with her. Adams stated that her brother also helps with her son by putting him on the bus when she is not able. She testified that she sometimes does household chores, when she has the energy, but that she is always tired and drowsy. She stated that she also

16

gets a fluttering in her chest, shortness of breath, sweats, nervousness and blurred vision. (Tr. 491).

Adams testified that she has had several, mostly part-time jobs in the past few years, none lasting more than six months.  She said she was terminated from one job for missing too many days, even though she had a doctor's note each time she missed a day, because the company needed someone who could be reliable.

Plaintiff said the Office of Family Services ("OFS") had referred her to Louisiana Rehabilitation Services and that the OFS allowed her to keep her benefits, although she was not working, when she agreed to go to counseling three days a week.  (Tr. 492).  She stated that Volunteers of America pays her rent and helps her with her other bills and personal items, such as clothes and shoes for her son, and sometimes transportation.  She said she used to go swimming with her son at the lakefront but has not done so since April 2004 because she has become afraid of the water.  (Tr. 493).

Adams testified that she told her doctor she no longer hears voices when she takes her medication because she did not want her doctor to change her medication.  However, she said that she was not being honest when she said that, and she later told the doctor that she still hears voices and needs a different medication.  She stated that this was the doctor who had put her in the hospital.  (Tr. 494).

Plaintiff stated that she had worked at Boomtown Casino for six months and as a security guard for a few months.  (Tr. 505).

C.     Medical Expert Testimony

A clinical psychologist, Carlos Kronberger, testified that he has been practicing for 22 years.  (Tr. 494).  He noted that Dr. Chavez reported on September 10, 2004 that plaintiff had achieved a verbal IQ score of 80, a performance IQ score of 67 and a full scale IQ score of 72, but that Dr. Chavez felt she was probably malingering during the testing.  (Tr. 494).  Dr. Kronberger stated that Dr. Chavez used three different measures that indicated malingering, one of which revealed very powerful malingering.  Dr. Kronberger said that Dr. Chavez "discovered [probably should be discounted] his own conclusions because of what he calls the traumatic history of the claimant."  (Tr. 495).[2]

Dr. Kronberger testified that he did not believe that plaintiff's IQ test scores were valid because he found no question of any cognitive impairment in the medical records that he reviewed and because plaintiff's achievement of a GED in February 2003 indicated at least a ninth-grade level of functioning across the board.  (Tr. 495).

Dr. Kronberger agreed with the consultative examiner, Dr. Hersh, that the record, including the reports of Drs. Mason, Cohen and Chavez, supports a diagnosis of major

---

[2]Dr. Chavez stated in his report that Adams met the criteria for probable malingering, but he reported her test scores anyway because of her traumatic history and possible other mitigating factors. (Tr. 421).

depression with psychotic features.  He stated that Adams "has some sort of problem with alcohol, which is not fully addressed" in the treatment record, "and it's not clear that she's completely in remission."  He observed that at least one of Dr. Mason's notes indicated that Adams had used alcohol during the Memorial Day weekend.  He said that the record sometimes states that plaintiff does not use alcohol and sometimes the record seems to have a question about it.  He noted that there was no mention of alcohol when Adams was hospitalized at Tulane in 2002, so he was not sure how alcohol plays into her diagnosis.  He stated that alcohol exacerbates depression and could lead to some of the psychotic features that plaintiff has described.  He testified that the medications she was taking were the correct ones to address a major depression and that the therapy should help her as well.

As to plaintiff's ability to work with the public, Dr. Kronberger saw no evidence that she is socially impaired.  (Tr. 496).  He noted that plaintiff had held a customer relations job and had been fired for excessive absences, not because there was any documented decompensation as a result of her medicines preventing her from sleeping or making her too drowsy to perform.  (Tr. 496-97).  Dr. Kronberger opined that she could handle the stress of a customer relations job, which he characterized as probably the most stressful job in a grocery store because it involved dealing with unhappy customers and with money.  To the extent that Adams has relationship problems outside

19

of work, Dr. Kronberger opined that the best thing for her would be to hold a job, which "would give her an enormous boost in her self-esteem and would help her alleviate all the stress of hopelessness and instability that she has in her life." (Tr. 497).

Upon cross-examination by plaintiff's attorney, who pointed out that plaintiff had a blood test in the hospital which was negative for alcohol and any street drugs, Dr. Kronberger stated that taking a drink once a year on a Memorial Day weekend or other holiday occasion would not exacerbate depression or create a symptom lasting for more than two years. (Tr. 497-98). Dr. Kronberger noted that Adams had been hospitalized for depression and suicidal intent as a teenager and again in 2002 and 2004. He said "there might be some question about her use of alcohol up to that point," meaning the 2002 admission, which was apparently precipitated by a fight with her boyfriend in which alcohol might have been involved, and because she told Dr. Cohen in December 2003 that she had stopped using alcohol just after the 2002 hospitalization. (Tr. 498-99). He agreed that the record does not show a constant use of alcohol.

Dr. Kronberger testified that the records do not reflect any consistent attendance at sessions with a psychiatrist and that this raises a question of noncompliance with medications. (Tr. 499). In response to plaintiff's attorney's assertion that Adams had kept all of her appointments at the mental health clinic every month in 2004, Dr. Kronberger said he would take the attorney's word for it because he did not have all those

20

records but had only had three or four progress notes from 2004.  He also did not have any records of plaintiff's hospitalization in September 2004.  Dr. Kronberger stated that plaintiff's consistent attendance at the mental health clinic would probably correlate with her doing better and being able to hold a job.  He said he did not know why she lost her job at Sav-A-Center or what had happened since then because she had held the job only two months earlier, when she saw Dr. Chavez.  (Tr. 499-500).

Dr. Kronberger stated that Geodon[3] is an antipsychotic medication and that lithium is an antidepressant or mood stabilizer, which was probably prescribed because of moodiness and mood swings.  (Tr. 501-02).  He stated that plaintiff had not been diagnosed as bipolar, which is the usual reason for prescribing lithium.  He said Seroquel[4] is another antipsychotic medicine that is sometimes used as a sleep aid.

Dr. Kronberger testified that Adams is taking quite a few medications and that she may have some side effects, which could include the sweating, nervousness and fatigue

---

[3]Geodon (generic name:  ziprasidone hydrochloride) "is prescribed to treat schizophrenia.  It is also used for the short-term treatment of mania associated with bipolar disorder.  Researchers believe that it works by opposing the action of serotonin and dopamine, two of the brain's major chemical messengers."  PDRhealth, avail. at http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/geo1590.shtml.

[4]Seroquel (generic name: quetiapine fumarate) "combats the symptoms of schizophrenia, a mental disorder marked by delusions, hallucinations, disrupted thinking, and loss of contact with reality.  It is the first in a new class of antipsychotic medications.  Researchers believe that it works by diminishing the action of dopamine and serotonin, two of the brain's chief chemical messengers."  Id. at http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/ser1402.shtml.

she had described.  He said that no side effects were mentioned in the psychiatric notes that he had reviewed and that she had not reported any side effects to her prescribing psychiatrist. (Tr. 502-03).  He opined that people can work while taking those medicines and do not have to stay at home because of severe side effects.

The ALJ pointed out that Adams in her testimony denied that she had been drinking in 2002 when she tried to stab her boyfriend in self-defense, although the boyfriend had been drinking excessively and became violent; that Adams told Dr. Cohen that she had stopped drinking in 2002; that she denied any type of drinking problem after October 2002; and that, at her clinic visit on June 28, 2004, she admitted she had been drinking some alcohol on Memorial Day.  Dr. Kronberger said that such denials are typical of people who have a drinking problem.  He said that one drink would not disrupt the medications that plaintiff had been taking to counteract depression.  He opined that someone who had stopped drinking in 2002 would need to stay involved with Alcoholics Anonymous and go to meetings at least weekly to maintain their sobriety.  (Tr. 504).

D.    Vocational Expert Testimony

Nancy Favaloro, a vocational expert who has practiced for 23 years, testified at the second hearing.  The ALJ posed a hypothetical of a younger individual with a GED, no past relevant work and no exertional limitations, who has a moderate reduction in the ability to understand simple instructions, a mild reduction in the ability to carry out

22

simple instructions and a moderate reduction in the ability to deal with the public and co-workers.  (Tr. 505).

The vocational expert testified that such an individual probably could perform work available in the national economy.  She stated that the last moderate reduction might make it difficult because, while there are unskilled jobs that do not involve dealing with the public, there are not many jobs in which the person would not be around co-workers.  She gave examples of jobs such a claimant could perform, such as assembly work, housekeeping, kitchen preparation and some security and janitorial work, all of which are available in significant numbers in the state of Louisiana.  (Tr. 506).  She stated that a person who functions at a ninth-grade level would be able to perform these jobs because a ninth-grade level is just above being able to carry out simple repetitive instructions.

Upon cross-examination by plaintiff's attorney, Favaloro said that an additional marked limitation in responding appropriately to usual work pressures would make it more difficult for the claimant to be successful.  (Tr. 507).  Favaloro testified that, if the claimant also has marked limitations in ability to make a judgment on a simple, work-related decision, to interact with supervisors and to respond appropriately to usual work pressures, plus moderate limitations in ability to respond to changes in a work setting and

to interact with the public and with co-workers, "it would just add to the difficulties in sustaining employment."  (Tr. 508).

      E.     <u>Medical Evidence</u>

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 18-29).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections, and highlights noted below.

      F.     <u>Plaintiff's Appeal</u>

The ALJ found at the fourth step of the sequential analysis that Adams has no exertional restrictions and, according to his list of findings, she has no limitations in comprehending and carrying out simple instructions or in dealing with the public and co-workers.  (Tr. 44).  Adams argues that the ALJ failed to consider and determine her residual functional capacity properly.  She makes several arguments under this listing of error, which essentially amount to an argument that substantial evidence does not support the ALJ's conclusions.

First, plaintiff contends that she has certain moderate and marked restrictions in some of her abilities to function in a work-related setting and that the ALJ erred in finding that she has <u>no</u> limitations in comprehending and carrying out simple instructions or in dealing with the public and co-workers.  Although the list of the ALJ's findings

24

(Tr. 44) states that plaintiff had <u>no</u> limitations, the ALJ noted in the body of his opinion (Tr. 42) and in the hypothetical that he posed to the vocational expert that Adams has a <u>moderate</u> reduction in these two abilities.  (Tr. 505).  The vocational expert's testimony was based on this hypothetical.  The jobs that the ALJ cited at the fifth step of his sequential analysis (Tr. 42-43) were those that the vocational expert identified as available for a person with those moderate limitations.  The ALJ credited her testimony and found that plaintiff is capable of performing work activity that exists in significant numbers throughout the national and statewide economies.  (Tr. 43).

In addition, the ALJ assigned great weight (Tr. 38) to the conclusions of the state medical consultant, Lawrence Guidry, Ph.D., who opined that Adams had moderate limitations in several areas of concentration and persistence:  the ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal work day and week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Guidry also assessed moderate limitations in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, and the ability to respond appropriately to changes in the work setting.  Dr. Guidry judged that

25

Adams is capable of routine, repetitive type work of the kind she has done in the past. (Tr. 221-22).  The ALJ cited that opinion and gave it significant weight in his own opinion.

Thus, it appears that the ALJ erred in his list of findings when he found <u>no</u> limitations in comprehending and carrying out simple instruction or in dealing with the public and co-workers, but that error does not affect his conclusions when his opinion is considered in its entirety.  Substantial evidence supports the findings in the body of his opinion that plaintiff suffers from moderate limitations in comprehending and carrying out simple instruction or in dealing with the public and co-workers and that such limitations do not preclude her from performing the jobs that the vocational expert named, an opinion that the ALJ credited in his opinion.

Furthermore, the ALJ explained his reasons for rejecting certain opinions in the medical record that plaintiff had marked limitations in any functional area.   The ALJ discussed all of the treating and consulting physicians' reports in detail in his opinion and explained why he gave minimal or no weight to the findings of marked limitations by consulting internist, Sheldon Hersh, M.D.; consulting psychologist, Michael D. Chafetz; and consulting psychiatrist, Alvin Cohen, M.D..  The ALJ also explained why he gave great weight to the opinions of Drs. Guidry and Kronberger, portions of Dr. Cohen's conclusions and the opinion of Dr. Chafetz that plaintiff had been malingering during

psychological testing, which undermined Dr. Chafetz's opinion that she had certain marked limitations.

Plaintiff argues that Dr. Kronberger's testimony should not have been accorded significant weight because he did not review all of plaintiff's medical records. However, it appears from his testimony that he reviewed all but a couple of progress notes from the West Jefferson Mental Health Clinic in 2004 and the records of the brief, overnight hospitalization in the emergency room at Meadowcrest Hospital on September 18, 2004. The remainder of plaintiff's voluminous medical records constitute substantial evidence upon which Dr. Kronberger relied in his testimony.

When weighing medical opinions, the ALJ has considerable discretion and is free to reject the opinion of any physician if the evidence supports a contrary conclusion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d), (e); Newton v. Apfel, 209 F.3d 448, 455-56 (5th Cir. 2000); Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994); Spellman, 1 F.3d at 364; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). Although "ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability[,] . . . [t]he ALJ may give less weight to a treating physician's opinion when there is good cause shown to the contrary." Loza, 219 F.3d at 395 (quotations omitted); accord Newton, 209 F.3d at 455-56. "The ALJ cannot reject a

27

medical opinion without an explanation."   Loza, 219 F.3d at 395.  However, "'[t]he treating physician's opinions are far from conclusive.'  For good cause shown, the ALJ may discount, or even disregard entirely, the opinion of the treating physician."  Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999) (quoting Greenspan, 38 F.3d at 237).  The ALJ may give less weight to a physician's opinion when the opinion is so brief and conclusory that it lacks strong persuasive weight, is not supported by medically acceptable clinical or laboratory diagnostic techniques, or is otherwise unsupported by the evidence.  Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001); Leggett, 67 F.3d at 566; Spellman, 1 F.3d at 364.

The ALJ's reasons for rejecting marked limitations in plaintiff's functioning are adequately explained and substantially supported by conflicting evidence.  It is the ALJ's province to resolve conflicts in the record.  Newton, 209 F.3d at 452.

Plaintiff also contends that the ALJ erred when he rejected her Global Assessment of Functioning ("GAF") scores between 50 and 60 as accurately reflecting her mental status.  "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) ("DSM-IV")).

28

The ALJ rejected the scores between 50 and 60 because he stated that Adams was not suicidal or impulsive when those scores were assessed.   However, the ALJ misinterpreted those scores.  A GAF score between 51 and 60 reflects only "'moderate symptoms,' such as a flat affect, or 'moderate difficulty in social or occupational functioning.'"  Id. (quoting DSM-IV at 34).  Thus, if the ALJ had accepted those scores with their correct interpretation, they would support a finding that plaintiff had only moderate impairments.  This assignment of error therefore does not assist Adams in her argument that she had marked impairments.

Adams next argues that the ALJ erred when he stated that she voiced complaints of migraine headaches on only four occasions and when he found no evidence that migraine headaches significantly impacted her activities of daily living.  Adams correctly notes that the record contains more than four complaints and/or diagnoses of migraines.  Nonetheless, this error does not prejudice Adams because the record substantially supports the ALJ's finding that her migraine headaches were not severe, responded to medication and did not significantly limit her activities of daily living or her ability to work.

Most importantly, the ALJ found that plaintiff's allegations concerning her symptoms, pain and functional limitations were exaggerated, unsupported by the medical record and not credible.  The ALJ has the responsibility to evaluate the credibility of

witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and his evaluation is entitled to considerable deference by this court.  Falco v. Shalala, 27 F.3d 160, 164 & n.18 (5th Cir. 1994); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Villa, 895 F.2d at 1024.  The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required.  Falco, 27 F.3d at 163-64; Godbolt v. Apfel, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.); accord James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 164).

In the instant case, the ALJ explained his reasons for finding that Adams was not credible.  These reasons included Dr. Guidry's finding that plaintiff's allegations were only partially credible and she had only moderate limitations in some areas, and Dr. Chafetz's finding, in which Dr. Kronberger concurred, that plaintiff had malingered during her psychological testing for probable secondary gain.

The ALJ also noted that plaintiff was noncompliant with her psychiatric treatment regimen but was able to maintain employment for up to six months when she was taking her medication.  He took notice that she quit or caused herself to be fired shortly before the hearing before him and just before the expiration of six months, which he found to be a self-serving attempt to bolster her case for receiving benefits when she knew that only a job that lasted less than six months could be considered an unsuccessful work

attempt under the Commissioner's regulations.  He noted that Adams was motivated to obtain and had obtained her GED.  He found that she was not isolated and has no difficulty carrying out her activities of daily living or maintaining social relationships.

Furthermore, the ALJ stated that the medical record did not support plaintiff's allegations of severe panic attacks.  He observed that her reports of auditory hallucinations were extremely vague and that, in general, those hallucinations since age 15 have not interfered with her ability to carry on with her life, obtain a GED, take care of her child, work and maintain social relationships.  He noted that plaintiff has not required hospitalization for mental problems since July 2002.

On September 18, 2004, Adams presented to the Meadowcrest Hospital emergency room by ambulance because of a claimed suicide attempt by drug overdose. However, she admitted at the hospital that she would not kill herself, her toxicology screen was negative and there is no medical record of her stomach having been pumped out.  The consulting psychiatrist concluded that she was only "acting out" and was not considered a risk of suicide.  (Tr. 437).  The ALJ found this hospitalization "suspect" as an attempt to bolster a finding of disability.

Given the ALJ's assessment of plaintiff's credibility and his resolution of the conflicting evidence in the medical record, substantial evidence supports his findings concerning plaintiff's residual functional capacity.

<u>CONCLUSION</u>

The ALJ did not err by failing to consider and determine plaintiff's residual functional capacity properly.  Substantial evidence supports the ALJ's  findings that plaintiff has the residual functional capacity to do work with the restrictions noted in his opinion.

**<u>RECOMMENDATION</u>**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this  <u>19th</u>  day of June, 2006.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE